RECEIVED
APR 2 0 2012
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| TIMOTHY D. EARLY | CIVIL ACTION NO. 6:09-CV-00288 |
| VERSUS | JUDGE DOHERTY |
| WISE WELL INTERVENTION SERVICES, INC., ET AL | MAGISTRATE JUDGE HILL |

### MEMORANDUM RULING

Currently pending before the Court is a motion for summary judgment [Doc. 210] filed by third party defendant Liberty Mutual Insurance Company ("Liberty"). By way of its motion, Liberty seeks dismissal of the third party complaint brought against it by Harvest Oil & Gas, LLC ("Harvest") and Superior Energy Services, LLC ("Superior"), on the basis that "Superior's and Harvest's claims for contractual defense and indemnity and additional insured coverage against Liberty Mutual lack merit because the Harvest/Wise Well Intervention Services, Inc. ("Wise Well"), contract is not a maritime contract and instead is subject to Louisiana law." [Doc. 210-2, p.4(footnote omitted)] Intervenor SeaBright Insurance Company ("Seabright") joins in Liberty's motion. [Doc. 217] Third-party plaintiffs, Harvest Oil & Gas ("Harvest") and Superior Energy Services, L.L.C. ("Superior") oppose the motion. [Doc. 214]

I.  **Factual and Procedural Background**

Plaintiff Timothy Early filed this lawsuit, alleging he was injured due to a defectively designed coil tubing unit. More specifically, plaintiff alleges, "the Coil Tubing Unit and its ladder/stair were defective and unreasonably dangerous in normal use because the stair was designed

1

and manufactured without a handrail, the stair had no means of being properly secured to the landing or deck, [and] the treads and risers were designed and fabricated improperly and/or in violation of applicable regulation." [Doc. 186-1, ¶ 9] At the time of the incident, plaintiff was the Division Manager of the Tool Division of Wise Well Intervention Services, Inc. [Doc. 153-4, p.3] Wise Well had been retained by Harvest to perform coiled tubing services on Harvest's Well No. 13 in Vermilion Block 16 in Louisiana state territorial waters.[1] Harvest additionally retained "Superior Energy Services to provide the *L/B Superior Integrity* for this operation." [Doc. 107, p.7; *see also* Doc. 110, p.2] According to plaintiff, during performance of the coiled tubing services, "a perforating gun . . . got hung up, and so they called me out to remediate it."[2] [Doc. 153-4, p.5] Plaintiff alleges while he was working from the *Superior Integrity*, he yelled at the coiled tubing supervisor that the "pack-off [was] leaking blowing condensate in the Gulf." [Doc. 153-4, p.7] The supervisor then came "running out of the cab" of the coiled tubing unit and slipped and fell onto plaintiff, while descending the ladder used to ascend to and descend from the control console landing of Coil Tubing Unit 9-A; it is this ladder plaintiff alleges was designed defectively, leading to his injuries. [Docs. 186-1, ¶¶ 5, 7, 8; 153-4, p.7]

---

[1] Plaintiff was not a member of the coiled tubing crew, but rather, as noted, was in the Tools Division; his area of expertise was in thru-tubing and fishing. [Doc. 162-8, p.8]

[2] Plaintiff additionally testified at his deposition as follows:

> A. . . . The coil was out there initially to do the cleanout before the perforation run.
> Q. And so the coil was already out of the deck?
> A. That's correct.
> Q. And so they moved into position so that you could try to come and cure the problem with the plug?
> A. That's right.

[Doc. 153-4, p.5]

After the filing of plaintiff's suit, Superior and Harvest filed a third-party complaint against Liberty, asserting Liberty, as Wise Well's liability insurer, is "obligated to defend and indemnify Superior Energy and Harvest Oil & Gas, LLC for claims asserted by Timothy Early, and to name the 'Company Group', Superior Energy Services, LLC and Harvest Oil & Gas LLC as additional insureds under Wise Well Intervention Services' applicable liability policies in order to satisfy Wise Well's obligations for all defense costs, attorney's fees, indemnity settlement or judgments."[3] [Doc. 110, p.3] Thereafter, Liberty filed the pending motion for summary judgment, seeking dismissal of the third party complaint, "because the contract between Harvest and Wise Well Intervention Services ("Wise Well") is not a maritime contract and is subject to Louisiana law." [Doc. 210-1, p.1] In other words, Liberty argues Louisiana law governs the contract, and that the defense, indemnity and insurance obligations are unenforceable under the Louisiana Oilfield Indemnity Act ("LOIA"), La. R.S. 9:2780.[4]

---

[3] The third-party demand was brought against Liberty rather than Wise Well, as Wise Well "filed for bankruptcy protection, and is no longer a viable entity." [Doc. 110, p.1]

[4] The Louisiana Oilfield Indemnity Act provides, in part, as follows:

B.  Any provision contained in, collateral to, or affecting an agreement pertaining to a well for oil, gas, or water . . . is void and unenforceable to the extent that it purports to or does provide for defense or indemnity, or either, to the indemnitee against loss or liability for damages arising out of or resulting from death or bodily injury to persons, which is caused by or results from the sole or concurrent negligence or fault (strict liability) of the indemnitee, or an agent, employee, or an independent contractor who is directly responsible to the indemnitee.

. . . .

G.  Any provision in any agreement arising out of the operations, services, or activities listed in Subsection C of this Section of the Louisiana Revised Statutes of 1950 which requires waivers of subrogation, additional named insured endorsements, or any other form of insurance protection which would frustrate or circumvent the prohibitions of this Section, shall be null and void and of no force and effect.

3

Liberty, Superior, Harvest and Seabright have stipulated to the following facts:

1. On or about February 24, 2008, Tim Early, an employee of Wise Well Intervention Services, Inc. ("Wise Well"), alleges he was injured when he was struck by a co-worker who fell off the stair of a coil tubing unit that was located aboard Superior Energy Services, LLC's ("Superior's) liftboat *Superior Integrity* that was jacked up at Harvest Oil & Gas, LLC's ("Harvest's") Well No. 13 in Vermilion Block 16 in Louisiana state territorial waters.

2. Harvest chartered the *Superior Integrity*, which is a liftboat.

3. Early was not a member of the crew of the *Superior Integrity*.

4. Early ate and slept on the *Superior Integrity*.

5. The Wise Well crew used the *Superior Integrity* as a work platform, and at all times the *Superior Integrity* was jacked up at Harvest's Well No. 13 in Vermilion Block 16 in Louisiana state territorial waters. The *Superior Integrity* did not move from Well No. 13 after it was jacked-up on February 13, 2008.

6. There was no written work order.

7. There was a verbal call out for Wise Well to utilize the coil tubing unit to plugback to the Rob 54C Sand.

8. The coil tubing unit was brought out to the jacked-up *Superior Integrity* by a crew boat. A crane on board the *Superior Integrity* was used to offload the unit.

9. Early was called out to retrieve a cast iron drill bit that had become stuck down hole.

[Doc. 234, pp. 1-2]

## II.   Applicable Law

This Court must first address the legal dispute as to whether the master service contract is a maritime contract. To determine whether a contract is a maritime or non-maritime contract, a court

---

La. R.S. 9:2780.

must first undertake an examination of the "historical treatment in the jurisprudence" of the type of work at issue - in this case, coiled tubing operations - and then, second, the Court should engage in a "fact-specific inquiry" by applying the six factor test set forth in *Davis and Sons, Inc. v. Gulf Oil Corp.*, 919 F.2d 313, 316 (5th Cir. 1990). The six factors are:

> 1) what does the specific work order in effect at the time of injury provide? 2) what work did the crew assigned under the work order actually do? 3) was the crew assigned to work aboard a vessel in navigable waters? 4) to what extent did the work being done relate to the mission of that vessel? 5) what was the principal work of the injured worker? and 6) what work was the injured worker actually doing at the time of injury?

*Id.* at 316; *see also Hoda v. Rowan Companies, Inc.*, 419 F.3d 379, 381 (5th Cir. 2005).

**III.   Analysis**

    **A.   Historical Treatment**

The contract at issue, under which indemnity and contractual coverage is sought, is the master service contract between Harvest and Wise Well. Under an oral request, Wise Well returned to Harvest's inland waters well to engage in a "plugback," which the parties' arguments indicate is within the genre of coiled tubing operations, which were to be performed from the *Superior Integrity*, a vessel.

As stated above, the Court's first task is to investigate the historical treatment of the type of work at issue. As noted, whether indemnity and insurance coverage is owed will key first to the nature of the contract involved. If the contract is governed by Louisiana law, the Louisiana Anti-indemnity Statute might apply barring one or both; if maritime law governs the contract, argument is made the Louisiana Anit-indemnity Statute would not apply and thus, indemnity and insurance might be owed. Harvest and Wise Well entered into a master service contract; it is undisputed that pursuant to the master service contact and a subsequent oral call back, Harvest retained Wise Well

to perform coiled tubing services[5], more particularly, "to plugback [Harvest's well] to the Rob 54C Sand" [Doc. 234, p.2], and the plaintiff was performing or to perform "fishing" operations in conjunction with those operations. This Court has found no jurisprudence addressing the "historical treatment" of "backplugging" and/or "fishing," conducted in conjunction with a coiled tubing operation.)[6] Here, the actual service in play was retrieving a piece of equipment that had become stuck downhole during coiled tubing operations and all relevant operations were conducted *from a vessel, here a liftboat*. See *Hoda v. Rowan Companies, Inc.*, 419 F.3d 379, 381 (5th Cir. 2005)("No Fifth Circuit case has previously addressed whether torquing bolts on a blow-out preventer *from a jack-up drilling rig used as a work platform* constitutes a maritime contract." (Emphasis added)) Nevertheless, it appears self-evident that coiled tubing services, themselves, if not performed from a vessel, should have little to do with traditional maritime activity or commerce. *See generally, Underwriters at Lloyd's London v. OSCA, Inc.*, 2006 WL 941794, *2, *11 (5th Cir. 2006); *Vemex Trading Corp. v. Technology Ventures, Inc.*, 2011 WL 3270841, *1 (S.D.Tx.); *BJ Services Co., USA v. Thompson*, 2010 WL 2024725, *4 (W.D. La.). However, when conducted from a vessel when the vessel is an integral part of the operations, a different inquiry is raised which might command

---

[5]As described in *Underwriters at Lloyd's London v. OSCA, Inc.*, 2006 WL 941794, *2 (5th Cir. 2006):

> Coiled tubing is small diameter flexible steel pipe wrapped around a spool. Tools and machinery, referred to as the "bottom hole assembly" or the "tool string" are attached to the end of the tubing and placed into the well. The coiled tubing unit operator then forces, or "snubs" the tubing into the well, conducts the required procedure, . . . and then pulls the tubing and remaining tools out of the well.

[6]In fact, this Court has found very little relevant jurisprudence addressing coiled tubing operations. *Accord Delahoussaye v. Pisces Energy, LLC*, 2012 WL 1089083, *5 (E.D.La.)("[The parties] agree, as does the Court, that there is no prior Fifth Circuit case in which the maritime or non-maritime nature of a contract specifically involving workover recompletion and/or coiled tubing work like that performed on the MI–739–A platform.").

a different result.

Liberty argues contracts to provide coiled tubing and oilfield related services "involve oilfield equipment used to enhance the production of the wells [and] are not maritime contracts," citing *BJ Services, Inc. v. Thompson*, 2010 WL 2024725 (W.D.La.) (Trimble, J.).[7] [Doc. 210-2, p.9] Liberty further argues "using a vessel as merely a work platform–'where a contract is only incidentally related to a vessel's mission'–does not change this fact," citing *Devon Louisiana Corp. v. Petra Consultants, Inc.*, 247 Fed.Appx. 539 (5th Cir. 2007). Finally, Liberty argues: "Contracts for coiled tubing services are wholly analogous to contracts for wireline services . . . , which are non-maritime in nature. In both coiled tubing and wireline work, the vessel is used only as a mere work platform." [Id. at 10] Liberty cites to *Domingue v. Ocean Drilling & Exploration Co.*, 923 F.2d 393, 396 (5th Cir. 1991) and *Thurmond v. Delta Well Surveyors*, 836 F.2d 952, 955 (5th Cir. 1988) for the latter position. Thus, Liberty supports its position with "cases [*i.e. Domingue* and *Thurmond*] in which agreements for self-contained oil and gas activities, *that do not inherently depend on a vessel and crew*, are held not to constitute maritime contracts." *Hoda* at 383; *see also id.* at 382 (emphasis added).

Although neither Harvest nor Superior argue coiled tubing services, standing alone, have any relationship to traditional maritime activity, it is argued by plaintiff that "Wise Well's coil tubing work could not have been performed without the use of the *L/B INTEGRITY*'s crane," and thus, the

---

[7]It is important to note that *BJ Services* involved a contract to perform coiled tubing services on a **fixed platform** *located on the outer Continental Shelf. Id.* at *3. (The plaintiff in *BJ Services*, an employee of a coiled tubing services operator, was injured on the platform.) Accordingly, that court utilized the test set forth in *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009), which applies a "focus-of-the-contract test" to determine the situs of the controversy in contract cases under OCSLA, rather than the *Davis* test which applies to contracts where the OCSLA is inapplicable.

7

*Superior Integrity* in this instance, "was not merely a work platform, but the equipment of the vessel was required to be used by Wise Well in order to accomplish the goal of bringing the well back into production." [Doc. 214, p.4]

In *Devon Louisiana Corporation v. Petra Consultants, Inc.*, the Fifth Circuit undertook an examination of whether a contract to repair a fixed platform was a maritime contract. 247 Fed.Appx. 539 (5th Cir. 2007). Because, however, the Court had not previously considered that question, it found the first prong of the *Davis* analysis (*i.e.* an examination of the "historical treatment") to be "inconclusive." *Id.* at 544; *see also Hoda*, 419 F.3d at 381 ("in some circumstances, though not here, the historical treatment is clear enough to make the second part of the test 'unimportant.'"). Nevertheless, it found the Fifth Circuit "cases dealing with offshore oil and gas contracts provide helpful suggestions on how the present case should be resolved." *Id.*; *see also Hoda* at 381 ("*Davis*'s initial reference to the 'historical treatment in the jurisprudence,' while inconclusive, is nonetheless suggestive, for present purposes.") The *Devon* Court provided the following analysis of the pertinent jurisprudence:

> We . . . held in *Domingue* . . . , that where a contract is only incidentally related to a vessel's mission, it is not maritime. *Domingue* involved a contract for wireline services on an offshore well. The work order required the crew to use a jack-up drilling rig. Although a jack-up rig has been classified as a vessel for maritime law purposes, **in *Domingue* the use of a vessel was purely incidental to the execution of the contract,** *and nothing about the contract required that the contractor use a vessel instead of a mere work platform.*
>
> In contrast, the work in *Campbell v. Sonat Offshore Drilling, Inc.*, 979 F.2d 1115, 1123 (5th Cir.1992), **required the use of a vessel as such.** *Campbell* involved casing work *that required the use of a vessel such as a jack-up rig, along with its derrick and draw works, because there was no fixed platform or derrick at the work site.* Similarly, in *Davis* we noted that the "particular nature of the terrain and production equipment required" the use of a vessel. *Davis* involved a work crew that traveled from one offshore job site to another and made various repairs to the offshore facilities and thus required a vessel "that could function as a mobile work

8

platform."[8]

> In *Hoda*, ... we addressed an analogous situation in which the crew's "exact work did not require the use of [a] vessel," **but the work "could not be performed without the [vessel's] direct involvement." *Hoda* involved the torquing up and down of the bolts on blowout preventer stacks, a task that by itself did not require the use of the vessel or its crew but that would have been irrelevant and impossible if the vessel's crew had not used the vessel's rig to set the stacks and bolts in place.**

*Devon* at 544-45 (citations and footnotes omitted)(emphasis added).

The *Devon* court ultimately determined the contract before it was a maritime contract, reasoning:

> Although the "exact work" on the punch list did not require the use of a vessel *per se*, the failure of the parties to obtain a hot work permit meant that the welding work, which was a prerequisite for completing some of the tasks on the punch list, **had to be completed on a vessel, not the fixed platform**. . . . The contract here required that the parties provide a vessel *per se*, because **only a vessel working alongside the already existing fixed platform could provide a suitable place to perform the hot work**. As was the case in *Davis*, *Campbell*, and *Hoda*, the instant contract required that a vessel be provided.

*Id.* at 545.[9] (emphasis added) In conclusion, the Court stated, "The jurisprudence therefore indicates that where the use of a vessel as such is required for completion of the contract, maritime law

---

[8] *See also Davis* at 317 (mission of "mobile maintenance vessel" was "inextricably intertwined with maritime activities'").

[9] The *Devon* court further pointed out:

> It is undisputed that the hot work could have been completed on the oil and gas platform if the appropriate permit had been obtained. The inability to perform the hot work on the vessel was not caused by any physical or technical limitations but by the legal limitations resulting from the absence of a permit. That is, however, a distinction without a legal difference. *Hoda*, *Davis*, and *Campbell* do not require that the need for a vessel be caused by physical or technical limitations. **There is no practical difference between having to use a vessel because of physical realities and having to use one because of legal restrictions. A vessel is required in both situations.**

*Id.* at 545. (emphasis added)

appropriately governs." *Devon* at 545.

In the instant motion before this Court, the crane on the liftboat was being used in lieu of a derrick for the coiled tubing operations. Consequently, the tasks being performed pursuant to the verbal request, flowing from the master service contract, required the use of the liftboat's crane in order to be accomplished and, thus, as indicated by *Hoda, supra*, the contract work to be performed was "inextricably intertwined" with the maritime activities of the liftboat operating in inland waters. *Hoda* at 382 (**"Because the casing crew [in *Campbell*] required the use of the rig's derrick and draw works to accomplish its tasks, the contract work was deemed 'inextricably intertwined' with the 'maritime activities' of the rig and its crew."**) The liftboat was not acting merely as a work platform, but was supplying an essential aspect required to complete the task - its crane. The crane on the *Superior Integrity* was acting in lieu of a derrick and draw works - without which the work could not have been performed. Consequently, this Court finds the disputed contract's historical treatment might argue, factually, for its being a maritime contract.

**B.  *Davis* Factors**

As noted, after examining the historical treatment in the jurisprudence, a court should, in certain circumstances, particularly if the historical treatment is "inconclusive" or in question, apply the six factor test set forth in *Davis and Sons*. Out of an abundance of caution this Court will address the *Davis and Sons* factors as the historical treatment is, perhaps, not as clear as one might desire. The parties have provided little information pertinent to the *Davis* factors, save the following.

   1.   **What does the specific work order in effect at the time of injury provide?**

In this matter, there was no written work order. Rather, "[t]here was a verbal call out for

10

Wise Well to utilize the coil tubing unit to plugback to the Rob 54C Sand."[10] [Doc. 234, p.2]

### 2. What work did the crew assigned under the work order actually do?

"The coil tubing unit was brought out to the jacked-up *Superior Integrity* by a crew boat. A crane on board the *Superior Integrity* was used to offload the unit" from the crew boat and place it on the *Superior Integrity*. [Docs. 234, p. 2; 244, p.2] The crane on the *Superior Integrity* was used in performing the task. [Doc. 244, p. 2; Ex 2, p. 60] "Early was called out to retrieve a cast iron drill bit that had become stuck down hole." [Doc. 234, p. 2]

### 3. Was the crew assigned to work aboard a vessel in navigable waters?

"Harvest chartered the *Superior Integrity*, which is a liftboat." [Id. at 1] "Early was not a member of the crew of the *Superior Integrity*." [Id. at 2] "Early ate and slept on the *Superior Integrity*." [Id.] Liberty argues, "The Wise Well crew used the *Superior Integrity* as a work platform, and at all times the *Superior Integrity* was jacked up at Harvest's Well No. 13 in Vermilion Block 16 in Louisiana state territorial waters. The *Superior Integrity* did not move from Well No. 13 after it was jacked-up on February 13, 2008." [Id.]

According to Harvest and Superior (and unchallenged by Liberty):

Plaintiff, Timothy Early testified that the work of **Wise Well could not have been completed without the use of the crane.** (Exhibit 2, p. 60). **Wise Well was charged 12 hours of overtime every day for use of the crane.** (Exhibit 4, p. 6 and 8). **During the coil tubing operation, the crane developed mechanical problems and was shut down for approximately 18 hours. (Exhibit 3). During this time that the crane was not operational, Wise Well was merely standing by and could not perform the coil tubing operations.** (Exhibits 3 and 4). Photographs taken by the companyman on the job show Wise Well employees using the crane to begin stabbing the riser to make the initial trip in the hole. (Exhibit 1, p. 86-88 and referenced photographs).

---

[10]At the time of the accident, Harvest's Well No. 13 was shut in and had been completed at the Rob 54F Sand. [Doc. 162-8, p. 13]

[Doc. 244, p.2](emphasis added)

> 4. **To what extent did the work being done relate to the mission of that vessel?**

According to Liberty, "Wise Well's coil tubing work related only to the well enhancement, and not to the mission of the vessel." [Doc. 210-2, p.11] Liberty further contends, "Any use of the *Superior Integrity* to perform the coil tubing work was incidental to Wise Well's primary work of coil tubing services, which was not maritime in nature. Superior has not, and cannot, put forth any evidence that the contract required the use of a vessel." [Id. at 12]

According to Harvest and Superior:

> The mission of the *L/B Integrity* was to be the work platform for the completion work to have the well be placed back into production. **There was not a platform on the well head to work from. The entirety of the work to bring the well back into production was performed from the *L/B Integrity*.** (Exhibit 2, p.p.13-14, 30).[11] The use of the vessel was not merely incidental to the work being performed by plaintiff or other contractors. The work of the coil tubing directly related to the mission of the vessel to have the well brought back into production. The well could not be brought back into production without the coil tubing unit being placed onto the vessel and the work over of the well being completed.

[Doc. 214, p.6 (citation omitted)(emphasis added)]

> 5. **What was the principal work of the injured worker?**

All parties agree plaintiff was called out to retrieve a cast iron drill bit that had become stuck downhole. [Doc. 234, p.2]

> 6. **What work was the injured worker actually doing at the time of injury?**

The parties agree plaintiff "alleges he was injured when he was struck by a co-worker who

---

[11] Exhibit 2 contains portions of the deposition of Cap. Phil J. Esponge, Captain of the *L/B Integrity*. In the portions cited, Cap. Esponge testified the *L/B Integrity* is a "workover platform," which has "two cranes and an open deck to carry crewmen out to location." [Doc. 214-3, pp. 2-3] The vessel serves primarily as a work platform for third parties to work on wells. [Id. at 3]

12

fell off the stair of a coil tubing unit that was located aboard . . . [the] *Superior Integrity* that was jacked up at Harvest['s] . . . Well No. 13 in Vermilion Block 16 in Louisiana state territorial waters." [Doc. 234, p.1] According to Harvest and Superior, "Plaintiff states that he was called out to assist a Wise Well co-worker who was in the coil tubing shed above the deck of the liftboat. (Exhibit 6, pp. 36-38).[12] When he arrived at the coil tubing unit, he claims that his co-worker slipped down the stairs and fell on him." [Doc. 214, p.7]

### C. Finding as to nature of the contract

The Court concludes after review of the historical treatment, applicable jurisprudence cited, factual scenario, and review of the *Davis and Sons* factors, the contract at issue in this matter is a maritime contract. Unlike *Domingue* and *Thurmond*, the use of a vessel in this matter was not purely incidental to the execution of the contract. Rather, the work for which Wise Well was retained could not have been performed without the use of a suitable vessel, and in particular its crane; the work could not be completed without the use of the crane that was on the vessel as the crane was used in lieu of a derrick and draw works. [Doc. 214-4, p.2] As noted, the crane was used, in lieu of a derrick and draw works, to hold the equipment that was going downhole as the platform had neither a crane nor derrick and draw works. [Id.] Additionally, all of plaintiff's work was conducted from the vessel, as the walkway surrounding the well was not of sufficient size to house the CT Unit.[13] [Id. at 3] In this matter, the *Superior Integrity* did not serve as a mere work platform to execute a

---

[12]Exhibit 6 does not contain the referenced pages.

[13]The well at issue had only a small walkway around it. [Doc. 212-2, p. 63] According to plaintiff, the only work performed on the walkway of the well (work in which plaintiff did not participate) was the coiled tubing crew would "put a ladder to get on top of the wellhead when they're stabbing the wellhead." [Id. at 64] The vessel was required in order to have adequate room for all the equipment, and to have adequate space to utilize the equipment. [Id.]

13

particular service contract, but rather, the *Superior Integrity* and its equipment, *i.e.* its crane, was integral to the contracted work to be performed; without the *Superior Integrity*'s crane and walk ways the coiled tubing work could not have been accomplished. Thus, Wise Well's services were "inextricably intertwined' with the vessel's direct involvement and were dependent upon Superior's placement of the equipment on which Wise Well's employees worked and the crane on the *Superior Integrity*, without which the contracted work could not have been performed. *See Hoda* at 383 ("Greene's services were 'inextricably intertwined' with the activity on the rig, were dependent on Rowan's placement of the equipment on which Greene's employees worked, and could not be performed without the rig's direct involvement.") "As was the case in *Davis, Campbell, . . . Hoda,* [and *Devon*,] the instant contract required that a vessel be provided." *Devon* at 545. Here, again, a vessel was required for the work of the contract to be performed and thus, the vessel was inexorably intertwined with the work of the contract. Accordingly, the Court finds the contract between Harvest and Wise Well is a maritime contract.

### D.    Contractual Choice of Law

As a marine contract, maritime law will govern the contract and its provisions. However, the master service contract contains a choice of law provision, which absent its provisions being against public policy, maritime law allows. The contract between Harvest and Wise Well contains an inartfully drafted choice of law provision. Specifically, the contract provides as follows:

> **11.0   GOVERNING LAW**
> Except as otherwise expressly provided in this Contract, this Contract shall be governed by and construed in accordance with the laws of the State of Louisiana, without regard to conflicts of law principles that might apply the law of another jurisdiction. For Work performed offshore, the provisions of this Contract shall be construed in accordance with the General Maritime Law of the United States or, if permissible, with the laws of the state applicable to the Work.

14

[Doc. 210-4, p.8]

"Under federal maritime choice of law rules, contractual choice of law provisions are generally recognized as valid and enforceable." *Great Lakes Reinsurance (UK) PLC v. Durham Auctions, Inc.*, 585 F.3d 236, 242 (5th Cir.2009); *see also Stoot v. Fluor Drilling Services, Inc.*, 851 F.2d 1514, 1517 (5th Cir. 1988) ("In the absence of a choice of law clause, the construction of indemnity provisions in a contract involving maritime obligations is governed by maritime law"). The parties' choice of law clause in an admiralty contract will govern "unless the [chosen] state has no substantial relationship to the parties or the transaction or the state's law conflicts with the fundamental purposes of maritime law." *Stoot v. Fluor Drilling Servs., Inc.*, 851 F.2d 1514, 1517 (5th Cir.1988).

Here, the contract provides in the paragraph entitled "Governing Law" that the Contract is to be construed in accordance with Louisiana law. However, the foregoing statement is immediately modified, in that, "For Work[14] performed offshore, the provisions of this Contract shall be construed

---

[14]The contract describes the term "Work" as follows:

From time to time, if, as and when Company desires Contractor to provide services and associated materials, Company shall send to Contractor a Request for Services in the form set forth in Exhibit "A", Request for Services. The Request for Services shall describe in detail the services to be performed and any associated material to be provided (herein referred to as the "Work").

[Doc. 210-4, p.1] As previously noted, no written work order or "Request for Services" was sent to Wise Well in this matter; rather, there was a verbal call-out. Although the contract states the Master Service Agreement, the Request for Services, and the Exhibit entitled "Compensation" "shall collectively constitute the 'Contract'" [Doc. 210-4, § 1.1; *see also* § 21.8 ("This Contract, together with the applicable Request for Services, is the entire agreement between the parties as to the Work")], the contract is silent as to whether or not the MSA remains applicable to work performed without a written Request for Services. *Compare Jones v. Francis Drilling Fluids, Ltd.*, 613 F.Supp.2d 858, 863-64 (S.D.Tx. 2009)(Although MSA instructed parties that work orders were to be reduced to writing, the MSA further provided that "failure to do so shall not prejudice the application of the Master Agreement with respect to any Work undertaken. . . ."). No party argues the failure to issue a written "Request for Services" renders the MSA inapplicable to the Work performed in this matter. Additionally, the Court

in accordance with the General Maritime Law of the United States or, if permissible, with the laws of the state applicable to the Work." The term "offshore" is not defined in the contract. Thus, it is unclear whether or not the parties intended the phrase "for work performed offshore" to include work performed in Louisiana inland waters or to address the waters beyond Louisiana's territorial reach., and onto the Outer Continental Shelf.

The only other provision in the contract providing any helpful context for the term "offshore" states:

> For Work to be performed under this Contract *in or offshore Louisiana*, Contractor and Company agree that (I) Contractor's employees are covered under the Louisiana Worker's Compensation Act . . .; (ii) the Work is an integral part of or essential to the ability of Company to generate its goods, products and services; and (iii) for purposes of . . . [the Louisiana Worker's Compensation Act], Company is the direct, immediate or statutory employer of Contractor's employees.

[Doc. 210-4, p.5 (emphasis added)] From the foregoing provision, it, thus, appears the parties did not intend for the term "offshore" to exclude Louisiana inland waters. In essence, the foregoing provision seeks to make Harvest the statutory employer of Wise Well's employees, "[f]or Work to be performed . . . in or offshore Louisiana," to allow Harvest the protections provided by the Louisiana Worker's Compensation Act. If the term "offshore Louisiana" is to be given meaning within that context, it arguably would refer to Louisiana state territorial waters as once the situs of the work to be performed is beyond Louisiana territorial waters, the Louisiana Worker's Compensation Act is much less likely to apply.[15] However, the term "offshore," remains an

---

notes the conditions of a verbal call-out could not modify the MSA, pursuant to the terms of the MSA, [*see* Doc. 210-4, ¶ 21.8 ("No modification of this Contract shall be of any force or effect unless it (1) is in writing. . . .")], and thus, one could argue the master service agreement, at least, contemplated verbal modifications.

[15]Although, with regard to non-seamen, there are instances where state compensation might apply within the context of injuries occurring on the outer Continental Shelf or on navigable waters

16

undefined term and there is no language limiting "offshore" to those waters away from land *and beyond* the reach of Louisiana territorial waters. Therefore, it appears the stronger argument is that the term "offshore," as used in the contract, references work not performed on land, but rather "offshore," and thus, includes state territorial waters (or "inland waters")[16]; to read the provision so as to exclude inland waters would read into the contract distinctions not included, and perhaps, render the provision meaningless when looking to the other usage of the term within the contract - *i.e.* workers' compensation - in the vast majority of cases. *See e.g. Chembult Trading LLC v. Chemex Ltd.*, 393 F.3d 550, 555 (5th Cir. 2004)("A basic principle of contract interpretation in admiralty law is to interpret, to the extent possible, all the terms in a contract without rendering any of them meaningless or superfluous.") Accordingly, the Court finds the work done pursuant to the

---

beyond state territorial waters (*e.g.* "maritime but local" cases, "twilight zone" cases), in the vast majority of cases, the Longshore Harbor and Worker's Compensation Act will apply. *Compare Bienvenu v. Texaco, Inc.*, 164 F.3d 901, 908 (5th Cir. 1999)(LHWCA applies to workers injured in the course of their employment on navigable waters if their presence on the water at the time of injury was neither transient or fortuitous); 43 U.S.C.A. § 1333 ("With respect to disability or death of an employee resulting from any injury occurring as the result of operations conducted on the outer Continental Shelf for the purpose of exploring for, developing, removing, or transporting by pipeline the natural resources, or involving rights to the natural resources, of the subsoil and seabed of the outer Continental Shelf, compensation shall be payable under the provisions of the Longshore and Harbor Workers' Compensation Act."); 33 U.S.C.A. § 933(I) ("The right to compensation or benefits under this chapter shall be the exclusive remedy to an employee when he is injured . . . by the negligence or wrong of any other person or persons in the same employ. . . ."); *LeSassier v. Chevron USA, Inc.*, 776 F.2d 506 (5th Cir. 1985); Shoenbaums Admiralty and Maritime Law - Practitioner Treatise Series § 7-3 (5th ed. 2011)("The Longshore Act remedy is intended to be the exclusive remedy against the employer; state workers' compensation statutes are presumptively not applicable. Only government workers and seamen are excepted from coverage under section 1333(b)" (footnotes omitted)); *with id.* ("By contrast, fixed platform workers engaged in extractive activities in state waters do not come under the OCS Lands Act. In order to qualify for Longshore Act benefits, they must rely directly on the LHWCA itself. This may be difficult, because in *Herb's Welding, Inc. v. Gray*, the Supreme Court held that offshore drilling is not maritime employment for purposes of the status test under the Longshore Act. If a worker does not qualify under the Longshore Act, he is relegated to his remedy under state workers' compensation law." (footnotes omitted)).

[16]*See also* R. de Kerchove, International Maritime Dictionary, (2d ed. 1961) ("**OFFSHORE.** Generally, clear of land.")

17

master service contract was done "offshore" Louisiana, thus, that portion of the choice of law provision applicable to this matter is the latter half, which states, "*For Work performed offshore*, the provisions of this Contract shall be construed in accordance with the General Maritime Law of the United States or, if permissible, with the laws of the state applicable to the Work." (emphasis added)

Consequently, as the work performed was performed "offshore," the contractual language dictates "the provisions of this contract shall be construed in accordance with the General Maritime law or, if permissible, with the laws of the state applicable to the Work." Thus, per the language of the contract, maritime law applies unless, "if permissible . . . the laws of the state applicable to the Work" should apply. The work in this matter was performed *from a vessel* located *on inland, navigable waters*, and thus maritime law applies "to the Work" performed pursuant to the contract - it is a maritime contract.[17] Consequently, there are no "laws of the [a] state applicable to the Work." Rather, the law applicable to the Work, *as per the contract*, would be the federal maritime law.[18]

In light of the foregoing, the Court finds the general maritime law applies to contract and the choice of law provisions do not select a law other than maritime law to apply, thus, Louisiana law

---

[17]Whether or not maritime law might, also, apply to a claim grounded in tort, is not the question before this Court and this Court makes no determination as to that separate legal question. *See e.g. Strong v. B.P. Exploration & Production, Inc.*, 440 F.3d 665, 669-70 (5th Cir. 2006)(A liftboat that was jacked up and not under sail is a vessel, failure to provide a safe workplace aboard a vessel is a maritime tort, and thus, federal maritime law applies of its own force); *Sanders v. Placid Oil Co.*, 861 F.2d 1374, 1376 (5th Cir. 1988)(Federal admiralty jurisdiction exists over a tort occurring on state territorial navigable waters, where the tort bears a significant relationship to traditional maritime activity); *Branch v. Schumann*, 445 F.2d 175, 177-78 (5th Cir. 1971)(Where alleged tort occurred on navigable state waters, admiralty retained exclusive jurisdiction of the accident, "notwithstanding the diversity character of the litigation and the fact that a party exercised his right to a jury trial," and once admiralty jurisdiction is established in that matter, *as to the tort*, "then all of the substantive rules and precepts peculiar to the law of the sea become applicable" *as to the tort*.) Here, this Court is interpreting *a contract* and what law applies to that contract and work - which is a separate question as to what law might apply as to any tort which might have occurred.

[18]No evidence has been presented and no party has in any way argued the inland waters were not navigable.

does not apply to the contract or indemnity provisions, and thus, the Louisiana Oil Field Anti-Indemnity Act is inapplicable to this dispute. Accordingly, the Court finds Liberty's motion - which "moves the Court to enter summary judgment in its favor dismissing the third party complaint of Superior Energy Services, LLC ("Superior") and Harvest Oil & Gas, LLC ("Harvest") because the contract between Harvest and Wise Well Intervention Services ("Wise Well") is not a maritime contract and is subject to Louisiana law" - to be unsupported in law and fact. Therefore, the motion for summary judgment [Doc. 210-1, p.1] is DENIED.

### IV.   Conclusion

In light of the foregoing, the motion for summary judgment filed by Liberty Mutual Insurance Company [Doc. 210], and in which SeaBright Insurance Company joins [Doc. 217], is DENIED.

THUS DONE AND SIGNED in Chambers, Lafayette, Louisiana, this 20 day of April, 2012.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE